**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                          :
MICHAEL WESTER,                           :
                                          :
                    Petitioner,           :          Civil Action No. 09-4767 (JAP)
                                          :
          v.                              :          **O P I N I O N**
                                          :
MICHELLE RICCI et al.,                    :
                                          :
                    Respondents.          :
_____:

**PISANO,** District Judge:

Petitioner Michael Wester ("Petitioner") filed the instant Petition ("Petition") seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a), and challenging a judgment of conviction rendered by the Superior Court of New Jersey. Respondents filed an answer to the Petition, and Petitioner traversed. Following his traverse, Petitioner moved this Court for an evidentiary hearing and requested appointment of counsel. Respondents opposed Petitioner's motions.

For the reasons expressed below, the Court will dismiss the Petition and will decline to issue a certificate of appealability, see 28 U.S.C. §§ 2253(c), 2254(a), (b), (c); Petitioner's motions will be dismissed as moot.

I.      **STANDARD OF REVIEW**

Section 2254(a) of Title 28 of the United States Code gives the Court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  Smith v. Phillips, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.  It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts."  Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation  omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996).  Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary."  Stevens v. Delaware Correctional Center, 295

F.3d 361, 368 (3d Cir. 2002).  Where a federal claim was "adjudicated on the merits" [1] in state

court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

     A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the

governing law [as it is interpreted or] set forth in [the Supreme Court's, rather than in any state

court's or any circuit court's] cases' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different]

result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

     In other words, under the "'unreasonable application' clause, a federal habeas court may

grant the writ if the state court identifies the correct governing legal principle from th[e Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

at 413.  Whether a state court's application of federal law is "unreasonable" must be judged

objectively, which means that an application may be incorrect, but still not unreasonable. Id. at

409-10.

---

[1] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever; such determination is nonetheless subject to same degree of deference for the purposes of the court sitting in habeas review. See Harrington v. Richter, 2011 U.S. LEXIS 912 (U.S. Jan. 19, 2011).

A court begins the analysis by determining the relevant clearly established law.  See

Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the

holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the

relevant state-court decision."  Williams, 529 U.S. at 412.   A court must look for "the governing

legal principle or principles set forth by the Supreme Court at the time the state court renders its

decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

II.     **FACTUAL AND PROCEDURAL BACKGROUND**

Following his conviction, Petitioner pursued direct appellate challenges and, having lost

on appeal, sought post-conviction relief ("PCR").  Because the facts of Petitioner's conviction

and his appellate and PCR challenges appear directly related to the issues at bar, this Court finds

it warranted to replicate the extensive analyses conducted by the state courts.

A.      **Petitioner's Challenges Fostered on Direct Appeal**

As noted supra, Petitioner's conviction was affirmed on direct appeal by the Superior

Court of New Jersey, Appellate Division ("Appellate Division"), and the Supreme Court of New

Jersey denied Petitioner certification.

Addressing the events underlying Petitioner's conviction and his direct appellate

challenges, the Appellate Division stated as follows:

> [Petitioner] and Juanita Wester met in Paterson; they dated and lived together for
> ten years before marrying in October 1995.  They eventually moved to Ocean
> County in an attempt to curb their drug arid alcohol problems. For a while,
> [Petitioner] and Juanita lived with her two children -- a ten-year old boy, Michael,
> and a fourteen-year old girl, Lucette.  At the time of the incident in question,
> however Juanita and the children lived in Lakehurst; [Petitioner] had resided in a
> room in Brick since an incident of domestic violence alleged to have occurred in
> August 1998.

Juanita was found dead in the trunk of her Mercury Cougar in Paterson on November 20, 1998.  [Petitioner] was charged and convicted, after a trial, of the first degree murder of Juanita . . . .  The trial judge imposed a life sentence with thirty years parole ineligibility.  . . .  On appeal, [Petitioner] raise[d] the following arguments:

I.      [PETITIONER'S] STATEMENTS WERE THE PRODUCT OF CUSTODIAL INTERROGATION IN THE ABSENCE OF MIRANDA WARNINGS AND ACCORDINGLY, MUST BE SUPPRESSED.

II.     THE TRIAL COURT ERRED TO [PETITIONER'S] GREAT PREJUDICE IN ADMITTING EVIDENCE OF ALLEGED PRIOR INSTANCES OF DOMESTIC VIOLENCE .

III.    [PETITIONER'S] STATEMENTS MUST BE SUPPRESSED BECAUSE THEY W[E]RE OBTAINED WHILE HE WAS UNDER CUSTODIAL INTERROGATION AND WERE NOT ELECTRONICALLY RECORDED, IN VIOLATION OF HIS RIGHT TO DUE PROCESS.

IV.     [PETITIONER] WAS PREJUDICED BY THE TRIAL COURT'S UNDULY RESTRICTIVE RULINGS EXCLUDING EVIDENCE OFFERED BY [PETITIONER].

V.      BECAUSE THE TRIAL COURT EVINCED SIGNIFICANT HOSTILITY TOWARD [PETITIONER'S] COUNSEL, THE COURT ERRED IN DENYING [PETITIONER'S] REPEATED MOTION THAT THE TRIAL JUDGE RECUSE HIMSELF.

The contentions raised in Point IV and V are clearly without merit and do not warrant discussion. . . .  We also reject the arguments raised in Points I, II and III of [Petitioner's] brief for the following reasons.

In Point I, [Petitioner] argued that statements he made at the police station from the late afternoon of November 19 to the early morning hours of November 20, 1998 should have been suppressed. The trial judge conducted a plenary hearing to examine the admissibility of these statements.  Only Sergeant Hayes of the Manchester Township Police Department testified; he provided the following information.

Sergeant Hayes testified that he began investigating a November 19, 1998 missing persons report concerning Juanita.  According to the report, Juanita's daughter Lucette had last seen her mother at noontime on November 18, 1998 at their home in Lakehurst before Juanita had left to pick up [Petitioner] at his residence in

5

Brick.  During the morning of November 19, a police officer contacted [Petitioner], who advised he did not see Juanita on November 18.

Investigators from Brick, Manchester and the Ocean County Prosecutor's Office attempted to locate Juanita as well as verify [Petitioner's] whereabouts on November 19.  At approximately 5:20 p.m. on November 19, Sergeant Hayes and Detective Parker met with [Petitioner] at his home.  They requested that [Petitioner] accompany them back to the Brick Township Police Department in regard to Juanita's disappearance.  [Petitioner] agreed to go but stated the need to retrieve from his residence a gym bag containing miscellaneous paperwork.  He was permitted to enter the residence unescorted where he remained for approximately ten minutes before exiting and accompanying the officers in an unmarked car to the Brick Township Police Department.  On the way to the police department, [Petitioner] asked to stop at a convenience store to obtain cigarettes and lottery tickets.

Upon arriving at the police station, [Petitioner] was advised that he was not under arrest and was free to leave.  [Petitioner] also signed a form, at 5:56 p.m., advising that he was appearing to answer questions voluntarily concerning Juanita's disappearance and that he was free to terminate the questioning and leave at any time he chose.  The form said: "I hereby acknowledge that I have voluntarily agreed to answer questions by a representative of the Ocean County Prosecutor's Office.  I have been advised that these questions will pertain to the missing person investigation of Juanita Wester.  I am appearing voluntarily and I am aware that I am free to terminate the questions and leave at any time I so choose."

Sergeant Hayes and Detective Parker spoke with [Petitioner] for approximately two hours.  [Petitioner] spoke about his history with Juanita, the possible whereabouts of Juanita, and his own whereabouts on November 18.

During his rendition of his activities on November 18, [Petitioner] said he awoke at around 8:00 a.m. and received a phone page from Juanita about forty minutes later.  [Petitioner] returned her call.  Juanita told him that she was in Manchester applying for welfare and doing paperwork related to her "section eight housing."  She also mentioned that she and [Petitioner] had an appointment with an attorney for that day, but [Petitioner] informed her that the appointment was not for November 18 but for November 19 at 2:00 p.m.

[Petitioner] told the officers that he then watched television between 9:00 and 10:00 a.m. but he could not account for his activities between 10:00 and 11:30 a.m.  Between 11:30 a..m. and 12:15 p.m., he called Juanita again.  She said that she "was having trouble getting going" and that she had not yet gone to the welfare department.

[Petitioner] described his other activities in his residence between noontime and 2:30 p.m.  At approximately 2:30 p.m., [Petitioner] advised his landlord that he was going to Target to purchase rollerblades for the children and, at 3:00 p.m., he called Lucette to confirm their shoe sizes.  [Petitioner] advised that he walked from his home to a Target retail store.

Michael paged [Petitioner] at 3:39 p.m., and [Petitioner] returned the call a few minutes later.  The line was busy so [Petitioner] continued his walk to Target where he arrived at 4:00 p.m.  A Target receipt confirmed that [Petitioner] purchased rollerblades at 4:15 p.m.  Defendant stated that he arrived home (also on foot) at 5:30 p.m. where he remained for the rest of the day.

[Petitioner also] advised [Hayes and Parker] of numerous other telephone conversations he had with Lucette and Michael. [The children] advised [Petitioner] that Juanita had neither called nor returned home.  In addition, [Petitioner] advised [Hayes and Parker] that he called the El Alambique Bar in Paterson, where Juanita worked weekends, but the bartender then working said she had not seen Juanita.

At this point in the interview, [Petitioner] was confronted with information that investigators had obtained a videotape from Target which showed [Petitioner] in the store and subsequently entering a dark colored Mercury Cougar fitting the description of the vehicle driven by Juanita on November 18.  [Petitioner] asked to see this videotape and a break was taken in the interview for that purpose. After the videotape was played, [Petitioner] confirmed that he was inside the store purchasing rollerblades for [the] children, but he denied entering the Cougar shown exiting the Target parking lot.

[Petitioner] was then confronted with information from a neighbor of his who advised [the police] that she had seen a dark-colored vehicle, possibly a Cougar, stop directly in front of [Petitioner's] residence in Brick on November 18.  This neighbor also had advised that the vehicle was driven by a tall, thin white female with dark hair (matching Juanita's description), and that she saw a male walk up to the vehicle in front of [Petitioner's] Brick home.  [Petitioner], upon being confronted with this information, again denied seeing his wife on November 18.

The interview continued, with [Petitioner] providing from his gym bag paperwork relating to the mortgage on the Lakehurst property.  [Petitioner] also produced a certified letter he received on November 18 regarding a claim filed against him by his sister-in-law, and his checkbook.  Sergeant Hayes asked if [Petitioner] had been to the bank on November 18.  At first, [Petitioner] said he was not sure but later advised that he went to the Hudson City Savings Bank on Brick Boulevard at

approximately 1:30 p.m. on November 18.  He continued to deny having seen Juanita on November 18.

At approximately 8:55 p.m., Sergeant Hayes asked [Petitioner] if he would consent to a search of his residence.  [Petitioner] advised that he would and signed a consent search form after having it read to him and after taking the opportunity to read it himself.

Subsequent information was provided by [another] neighbor that [Petitioner] was seen sitting in a dark-colored two-door vehicle in front of his residence at approximately 2:15 p.m. on November 18.  This neighbor advised that he did not observe anyone else in the vehicle and that [Petitioner] sat in the vehicle for approximately ten minutes, following which he backed the vehicle up to a barn located on one side of the property.  When [Petitioner] was advised of this information, he asserted that the neighbor was mistaken.

At approximately 12:30 a.m. on November 20, Sergeant Hayes was provided with information that Juanita's vehicle was located in Paterson.  When [Petitioner] was so advised, he became nervous.  [Petitioner] was asked whether it was possible that he was drinking on November 18 and did not remember seeing Juanita. [Petitioner] said this was possible and that he believed he had consumed some vodka on November 17.  [Petitioner] then stated that maybe it was November 18 that he had consumed alcohol at which point [Petitioner] stated that "something could have happened . . . it's possible something may have happened between [Petitioner] and Jenny, and [Petitioner does not] remember [it]."  After having given this statement, [Petitioner] was advised of his <u>Miranda</u> rights.  A rights and waiver form was read to [Petitioner].  He also took the opportunity to read the form, which he signed at 1:41 a.m. on November 20.  [Petitioner] further advised that he understood his rights, and advised the investigators, as he had said at the outset of the interview, that he would stay and continue to answer questions pertaining to Juanita's disappearance until she was located.

Sergeant Hayes then asked [Petitioner] why he would not admit to being in the vehicle depicted in the Target videotape.  [In response, Petitioner first] advised [Hayes] that he was afraid of what could happen to him, but then denied seeing his wife or being in her vehicle on November 18.  [Petitioner] further advised that he had not been in Juanita's black Mercury Cougar since August 1998. Approximately one hour after [Petitioner] was advised of his <u>Miranda</u> rights, Sergeant Hayes was informed that Juanita's body had been found in the trunk of her Cougar.  Sergeant Hayes advised [Petitioner] of this information; in response, [Petitioner] put his head down in his hands and stated, "what's going to happen to me now?"  [Petitioner] continued to deny any involvement in his wife's death but then stated, "I can't bring myself to tell you what happened."  He further advised,

"I have no recollection of seeing my wife or being in her car that day and cannot remember anything that happened after receiving the certified letter from his sister-in-law that day" and could not remember going to the bank that day as he had earlier advised.  [Petitioner] was asked to give a formal taped statement, but he said that he was "not mentally prepared" to do so.

Sergeant Hayes' testimony at the suppression hearing also revealed that [Petitioner] never asked for an attorney and never asked to return home.

[Petitioner now] argues that he was "in custody" during the interview with Sergeant Hayes and, therefore, the statements he gave before the <u>Miranda</u> warnings should have been suppressed.  We have acknowledged [in our prior decisions] that "it is not always easy to discern when a suspect is 'in custody,' and that each case must be decided on its own set of facts."  The test to be employed is an "objective one that focuses on the totality of the circumstances."  . . .

The questioning in this case started with [Petitioner's] stated willingness to assist in the investigation concerning [Petitioner's] missing wife.  [Petitioner] indicated that he was willing to help and accompanied the police to the station house.  There was then no subjective or objective evidence to suggest that he was being detained.  [Petitioner] was not inhibited in any way when he first met with the police and, as noted above, asked, and was permitted, to return inside his residence to get a gym bag.  The police also acceded to his request1 on the way to the station, to stop at a convenience store so he could get cigarettes and lottery tickets.

There was also no evidence of "overbearing police conduct" in the questioning.  Given [Petitioner's] solicitous attitude, there was no need for Sergeant Hayes to exert any type of undue pressure upon him.  In addition, when the interview began, and for quite a while during the interview, the police had no substantial evidence that a crime had been committed.  Sergeant Hayes was not informed that Juanita's car was located until well into the interview.  Upon [being advised] of that information, [Petitioner] became nervous, and stated that "it's possible something may have happened," whereupon [Petitioner] was read his <u>Miranda</u> rights.  It was only after giving the <u>Miranda</u> warnings that the first substantive evidence of a crime became known, that is, when Juanita's dead body was found in the trunk.

It is also true, as noted earlier, that the duration, place and time of the questioning can factor into the determination of whether a person being interviewed is in custody.  But, here, while in a room in the police station in the company of officers, [Petitioner] was informed and signed a form indicating he could stop the questioning at any time and leave.  He was allowed to walk out of the room to use

9

the bathroom on numerous occasions. These facts were not disputed and are all indicia supporting the conclusion that [Petitioner] was not in custody prior to the <u>Miranda</u> warnings.

We conclude that there was sufficient credible evidence for [Petitioner's] trial judge to find that, under the totality of the circumstances, [Petitioner] was not in custody until he was given <u>Miranda</u> warnings and we, thus, reject the argument asserted by [Petitioner] in Point I.

In Point II, [Petitioner] argues that [his] trial judge erred by allowing the admission of evidence regarding past claims of domestic violence.

The trial judge conducted a hearing . . . to consider the admissibility of five incidents of domestic violence [between Petitioner and Juanita]. The trial judge eventually held that proof of the June 9, 1996, June 15, 1997, February 17, 1998, and August 15, 1998 events, were admissible pursuant [state law of evidence].

We are satisfied that there was ample evidence in the record to support his findings and we discern no abuse of discretion [by] the trial judge[] . . . . The most controversial aspect of the trial judgels ruling concerned the admission of evidence that [Petitioner] allegedly choked Juanita on February 13, 1998. As to this incident, [Petitioner] contends that the evidence of choking was insufficient and, in addition, was unduly prejudicial because [as it turned out upon examination of Juanita's body,] Juanita died as a result of asphyxia brought about by manual strangulation. The trial judge concluded that there was "clear and convincing" evidence of [Petitioner] having choked Juanita beyond her mere allegations because he heard the testimony of a police officer who testified that when he responded to a call on that date, Juanita "had a very bright redness around her neck."

[Petitioner] contends that such a finding was precluded by the fact that the Family Part judge who heard the domestic violence matter did not make a finding that [Petitioner] choked Juanita. [Petitioner] has correctly observed that the Family Part judge only found that [Petitioner] "pushed and shoved" Juanita and made no finding of choking. However, the Family Part judge did not find that the choking did not occur. That is, the Family Fart judge found that "pushing and shoving" occurred and was sufficient to warrant the entry of a domestic violence restraining order. Having found sufficient evidence of domestic violence to issue a restraining order, the Family Part judge [must have found] it was unnecessary to make further findings. We are satisfied that these circumstances do not foreclose a later finding, for purposes of this criminal prosecution, that choking did occur. In hearing the evidence provided at the . . . hearing, the trial judge was convinced that choking had occurred and allowed the evidence to be heard by the jury which

10

then was entitled to weigh or reject this evidence.  Our review of the record leads us to conclude that there was ample evidence to support the trial judge's holding.  As for [Petitioner's] contention that the admission of evidence of his past choking of Juanita was unduly prejudicial, we are satisfied that the trial judge properly concluded that the evidence was probative as to identity and native, which was more than sufficient to outweigh the prejudicial effect.

In Point III, [Petitioner] argues that all the statements he made during the police interrogation should have been suppressed because they were not electronically recorded.  This issue . . . was previously rejected in our [prior decision addressing the same question, where] it was observed that "no New Jersey case has endorsed the bright-line rule that confessions are admissible only if electronically recorded."  We held . . . that the absence of a memorialized statement was a factor, but not the determinative factor, in the jury's determination of the alleged statement's occurrence and reliability.  In the present case, the trial judge correctly instructed the jury on its "function to determine whether or not the statements were actually made by [Petitioner] and, if made, whether the statements, or any portion of them, are credible." . . . [Therefore,] we reject [Petitioner's] argument.  While we are cognizant of the fact that [the] Supreme Court [of New Jersey] granted certification in [the above-discussed case], . . . because the Supreme Court has yet to adopt such a rule, [Petitioner's] argument must be rejected.

Docket Entry No. 11-3 (footnote 1 incorporated in the main text, remaining footnotes and citations to state law omitted, original brackets removed); certif. denied, State v. Wester, 181 N.J. 546 (2004).

B.    **Petitioner's PCR Challenges**

As noted supra, having his application for certification denied by the Supreme Court of New Jersey as to his direct appeal, Petitioner initiated PCR proceedings.  The Superior Court of New Jersey denied his PCR application, and Petitioner appealed.  The Appellate Division detailed Petitioner's two PCR challenges and the rationale for denying him PCR relief as follows:[2]

---

[2] Petitioner's third PCR challenge, seemingly not relevant to the case at bar, is nonetheless touched upon infra, due to the peculiarities of the Petition at hand, as received.

11

A judgment of conviction was entered on March 28, 2002 after a jury found [Petitioner] guilty of first degree murder . . . for killing his wife in 1998. He was sentenced to a term of life subject to thirty years parole ineligibility.

At a pre-trial conference on November 9, 2001, [Petitioner] was offered a plea agreement for aggravated manslaughter which would have resulted in a sentence capped at twenty years subject to seventeen years parole ineligibility. His attorney stated on the record that [Petitioner] "vehemently rejected" this offer. [Petitioner] elected to proceed to trial, maintaining his innocence throughout. [Petitioner] now claims he was so heavily medicated at the time of the pre-trial conference that he could not understand the plea offer. He contends that he would have accepted the plea offer if he had been of clear mind.

In his PCR petition, he claimed that he was denied effective assistance of counsel because . . . his trial attorney did not convey the plea bargain to him effectively and did not raise a psychiatric defense . . . .

The PCR court found that [Petitioner] was essentially playing "Monday morning quarterback," trying to undo with the benefit of hindsight his decision to reject the plea offer and go to trial. The court found [Petitioner's] claims to be a "fabrication" clearly inconsistent with the well-established record in the case and denied his petition.
. . .

To establish a claim for ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984) . . . . Under the <u>Strickland</u> test, "a reviewing court must determine: (1) whether counsel's performance 'fell below an objective standard of reasonableness,' and if so, (2) whether there exists a 'reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.'"

The first prong of the <u>Strickland</u> test can be satisfied by a showing that counsel's acts or omissions, considered in light of all the circumstances of the case, fell "outside the wide range of professionally competent assistance." In applying this prong "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." In assessing the reasonableness of counsel's assistance, a reviewing court must assess the performance of counsel with "a heavy measure of deference to counsel's judgments." "[T]here is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"

To rebut this strong presumption, a defendant must prove that trial counsel's actions were not "sound trial strategy."  "If counsel thoroughly investigates law and facts, considering all possible options, his or her trial strategy is 'virtually unchallengeable.'"

Counsel's performance will be considered deficient if counsel fails "to make 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  Finally, in order to evaluate a defendant's ineffective-assistance-of-counsel claim, a court "'must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"

In order to satisfy the second prong of the Strickland test, a defendant must show that the error committed was so serious that it undermines confidence in the outcome of the proceedings.  "The ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696.

If a defendant does not satisfy both prongs of the Strickland test, "'it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.'"

Here, [Petitioner] presents medical records, prison notes, prescriptions and charts in an effort to support his argument that he was heavily medicated and did not understand the plea offer that was extended to him.  A substantial number of the documents presented by [Petitioner] were obtained from the prison's medical records department.

[Petitioner's] argument rests principally on an undated report by Daniel Greenwald, M.D., prepared at least four and a half years after [Petitioner's] conviction and without Dr. Greenwald ever having met [Petitioner].  Dr. Greenwald relied on the pre-trial transcripts, medical records from the Ocean County Jail from August 1998 to some time in 2002 "with many gaps," and [Petitioner's] medical records from his hospitalization in October 1998, prior to the murder of his wife.  Based on these documents, Dr. Greenwald diagnosed [Petitioner] as "suffering from a combination of" alcohol dependence, dependence and/or abuse of various other substances, personality disorder and depression secondary to those three diagnoses.

Noting that "the records from the jail are not complete," "there are gaps in time," and "the examinations of [Petitioner] were apparently not done with a forensic object in mind," Dr. Greenwald concluded that "it is highly likely the [Petitioner's] condition interfered with his ability to grasp and analyze the strength

and weakness of the prosecution's case and his ability to come to a rational conclusion about accepting a plea bargain."

This report is unconvincing when weighed against the report of John J. Verdon, M.D., a psychiatrist who examined and evaluated [Petitioner] on January 11, 2002, before trial commenced at [Petitioner's] counsel's request because counsel was "concerned about [Petitioner's] ability to focus on topics at hand, his frequent yawning, and complaint of sleepiness." Dr. Verdon reviewed "scattered medical records from . . . the Ocean County Jail, which encompass August 30, 1999 through September 18, 2001." During the examination, [Petitioner] "indicated that he was still on multiple medications, including thioridazine 100 mg. at bedtime (an antipsychotic medication); trazodone 100 mg. at bedtime (a sedating antidepressant medication); as well as lithium carbonate 300 mg. in the morning and 450 mg. at night." Dr. Verdon concluded that the psychotropic medications "have no therapeutic benefit to the [Petitioner]," and strongly recommended "that these medications be halted promptly." He noted that at the time of his examination, [Petitioner] "was oriented to person, place, and time," and that "[h]is recent memory and remote memory were intact."

At the November 9, 2001 pre-trial conference, during which the plea offer was discussed, [Petitioner] responded appropriately each time he was called upon to speak. He stated his age and followed the court's calculation of his age upon release under both the plea offer and a first degree murder conviction. Contrary to [Petitioner] PCR claim, the record indicates that defense counsel was quite concerned with his ability to understand the proceedings and behave appropriately at trial.

. . . At the pre-trial conference, [Petitioner] concurred with his attorney's representation that he had earlier "vehemently rejected" the plea offer, and in fact confirmed that his feelings were still the same. His defense throughout the trial, as well as on appeal, was that he was not present when his wife was murdered and that someone else must have killed her. [Petitioner's] claim of innocence throughout the trial and appeal made it impossible for him to give a factual basis and enter a guilty plea.

We find nothing in the record to support [Petitioner's] claim that trial counsel was ineffective in explaining the plea offer or that [Petitioner] failed to understand the offer and its consequences.

[Petitioner] relies on [state law] for his argument that his trial counsel's failure to pursue a psychiatric/diminished capacity defense constituted ineffective assistance of counsel. In [that state case], the [Supreme Court of New Jersey] held that defense counsel's failure to pursue such a defense, without proper investigation,

14

could constitute deficient performance because "counsel has a duty to make 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary .' A failure to do so will render the lawyer's performance deficient." [Petitioner] contends that an evidentiary hearing was necessary to determine whether his trial counsel investigated a psychiatric/ diminished capacity defense.

In [that state case], the defendant had run down streets naked, openly hallucinated, and abused cocaine. Here, [Petitioner] was fully lucid, cooperative, and offered detailed explanations for where he was and what he was doing when his wife disappeared. In addition, Dr. Verdon – who examined [Petitioner] at counsel's request prior to trial – indicated that [Petitioner] was oriented to his surroundings, had intact memory, and was able to communicate. Under these circumstances, it was objectively reasonable for counsel to conclude that no diminished capacity or insanity defense was available to [Petitioner] and that his client's best defensive strategy was to create reasonable doubt in the minds of the jurors as to his involvement in his wife's murder, especially given that the State lacked direct evidence tying [Petitioner] to the crime. As the State points out in its brief, a "diminished capacity defense would have been inconsistent with and would have diluted the reasonable doubt defense such that an acquittal would have been impossible . . . . [Petitioner] was part and parcel of the chosen defense, and he should not be allowed to undo all the proceedings now because his strategy failed."

The PCR court noted that "there's nothing before this court presently to lead any reasonable practitioner . . . to believe that there was a viable diminished capacity defense that existed then and was left unexplored." We agree. [Petitioner's] argument does not satisfy the first prong of the Strickland test.

State v. Wester, 2009 WL 1034693 (N.J. Super. Ct. App. Div., Apr. 20, 2009) and Docket Entry

No. 11-8 (citations to state law and internal citations to federal law omitted, original ellipses and

original brackets removed); certif. denied, State v. Wester, 200 N.J. 206 (2009).

III.     **ACTUAL AND POTENTIAL CHALLENGERS RAISED IN THIS ACTION**

A.     <u>**Challenges Stated in the Petition, As Received**</u>

In his Petition at bar, Petitioner asserted *five* Grounds (with each of these Grounds copied verbatim from his direct appellate challenges); these five Grounds read – together with the factual predicates asserted in support of these Grounds – as follows:

Ground One:          The Taking of Petitioner's Statements Violated Due Process Because they were the Product of Custodial Interrogation in the Absence of <u>Miranda</u> Warnings.

Supporting Facts
When the authorities initially confronted Petitioner, five officers were present. Petitioner was placed in a twelve-by-ten-foot "interview room" in the basement of police headquarters, to which there was no "public access.  Petitioner was taken to police headquarters at 5:20 p.m., and questioned until 12:30 a.m., in a manner that could leave no doubt in his mind that the investigation was focused on him.  In response to that questioning Petitioner gave a detailed account of his activities on the day of the disappearance, and made an acknowledgment -- that if he was driving the victim's car, he had been involved in her disappearance -- that was the virtual equivalent of an acknowledgment of involvement.  And, all of this took place approximately four hours before <u>Miranda</u> warnings were ever administered.

Ground Two:          The Trial Court Erred to Petitioner's Great Prejudice in Admitting Evidence of Alleged Prior Instances of Domestic Violence.

Supporting facts
The trial court admitted evidence of five separate instances of alleged domestic violence relevant to the identity of the killer.  However, the evidence of those incidents is so massively prejudicial that the prejudice clearly outweighs its probative value.

Ground Three:        Petitioner's Statements were Obtained While He was Under Custodial Interrogation and were not Electronically Recorded, in Violation of His Right to Due Process.

Supporting Facts
Petitioner's incriminating statements were not electronically recorded.

16

Ground Four:       Petitioner's was Prejudiced by the Trial Court's Unduly Restrictive Rulings Excluding Evidence Offered by the Petitioner.

Supporting Facts

The trial court precluded Petitioner from introducing evidence of a "wet" condom found near the victim's body, evidence of drug use on the part of victim, and a photograph of the Paterson bar in which she worked.  It was Petitioner's theory of the case that the victim was killed in Paterson after he gave her $80 to purchase drugs there.  In summation, in support of this theory, the defense cited the facts that the window of the victim's car seemed to have be kicked outward, i.e., that she appears to have been struggling inside the car, and that her jewelry was missing.  Also, evidence of sexual assault was substantial, in that even though no DNA evidence, nor injury, was found in the pertinent bodily locations the victim was found essentially nude, with underwear stuffed into her mouth.  Moreover, the area resident who found the victim's car testified that "some" drug and prostitution activity took place in the area.

Ground Five:       Because the Trial Court Evinced Significant Hostility Toward Petitioner's Counsel, The Court Erred in Denying Petitioner's Repeated Notion that the Trial Judge Recuse Himself.

Supporting Facts

With regards to defense counsel's request for an adjournment of the trial date in order to have an expert perform DNA analysis, the trial judge stated:

> Are you intentionally trying to make this case so old that the evidence will be of no moment?

At the pretrial conference, the defense required an adjournment because it had received documents, which had been misplaced. The court first reacted:

> I am starting to get a very uneasy feeling . . . that I am getting my chain yanked, that the system is getting its chain yanked, and I think we are getting our chain yanked big-time, because the coincidence of the happenstance of these things coming so late in time is overwhelming.

After further inquiry as to the timing of the discovery of the additional materials, the court stated:

> I have to give pause to determine whether or not . . . this late discovery of this material in your possession, and this bringing it to my attention as a

17

> surprise . . . twenty days before we are to commence jury selection, is not
> without some ulterior motive.  And I have

Docket Entry No. 1, at 7-9 (underlining and bolding removed; ellipses in original).

The last sentence of the above-quoted excerpt was left unfinished: no continuation of this unfinished sentence was either originally received or ever submitted by Petitioner at a later point. Moreover, the above-quoted five Grounds were *not* included in the Petition, rather, they were stated in an "Addendum," which pages followed the Petition.  Notably, the Petition was signed on the last page of its pre-printed form, which preceded the "Addendum," hence making the Petition complete as is, i.e., as a filled pre-printed form; that filled pre-printed form expressly referred to only *four* Grounds, i.e., Grounds One, Two, Three and Four.  Any existence of Petitioner's Ground Five, which was the last ground included in the "Addendum," was wholly omitted from the pre-printed form.  See Docket Entry No. 1.

In other words, even the most lenient joint reading of the filled pre-printed form embodying the Petition and the "Addendum" that followed it suggested that: (a) Petitioner simply elected to end his factual predicate discussion of his Ground Five in the middle of the quotation of his trial judge's observation; and (b) no other legal argument or factual assertions were ever intended by Petitioner.[3]

---

[3]   Petitioner was given notice pursuant to Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), and informed the Court that he wished to have his Petition to be ruled upon as submitted. See Docket Entries Nos. 2 and 3.  In fact, the Clerk, due to a clerical error, forwarded Petitioner his Mason notice twice.  See Docket Entries Nos. 2 and 4.

**B.**     **Petitioner's Traverse to Respondents' Answer and His Following Motions**

      **1.**     **Petitioner's Traverse**

As noted at the outset of this Opinion, Respondents duly answered to the Petition, as it was received and docketed by the Clerk, i.e., Respondents answered to all Petitioner's *five* above-quoted Grounds.  See Docket Entry No. 11.  Respondents' answer (denying validity of each and every Ground) made it abundantly clear that Respondents were answering only to these challenges and no other.  See id.  Moreover, Respondents' answer was duly served upon Petitioner, hence allowing him an opportunity to advise Respondents and this Court that there were other grounds raised in his "Addendum," in addition to the above-quoted five Grounds, but – somehow – lost after Petitioner handed his Petition and "Addendum" to his prison officials for mailing to the Court.  However, Petitioner did not assert any such loss of pages: while Petitioner traversed to Respondents' answer, see Docket Entry No. 12, the entirety of this traverse was dedicated to his elaboration that his statements made prior to administration of Miranda warning should have been suppressed, i.e., Petitioner's traverse was limited to his elaboration on Petitioner's above-quoted Ground One.  See id.  Petitioner did not traverse or even discuss his challenges stated in Grounds Three, Four and Five, nor did he mention that any other challenge was lost from his "Addendum" or that Respondents left any of his challenges unopposed.  See id.

      **2.**     **Petitioner's Motions**

Following his filing of the traverse, Petitioner filed a motion seeking evidentiary hearing and appointment of counsel.  See Docket Entry No. 13.  Petitioner's motion and the brief submitted by Petitioner in support of this motion focused, again, on Petitioner's Miranda-based

challenges corresponding, roughly, to Petitioner's Ground One.  See Docket Entry Nos. 12 and

12-2.

>However, in addition to discussing his Ground One, Petitioner now stated, in his motion:

> With respect to *grounds six and seven* of the Petition (respectively, *trial counsel's failure to determine the inability of petitioner to understand the plea offer and counsel's failure to investigate a psychiatric defense*), petitioner believes that he is entitled to a federal evidentiary hearing because the state courts denied petitioner's request for an evidentiary hearing. . . . In state court, petitioner supported the claims in ground six and seven of the federal petition with medical records and undisputed evidence that petitioner was heavily medicated and suffered obvious side-effects, which included sleepiness, incoherence, and memory problems; evidence of petitioner's psychological diagnoses, which included bipolar disorder, major depression, and polysubstance abuse; evidence of petitioner's prior stints in treatment; an affidavit from his brother regarding petitioner's inability to stay focused, slurred speech, and confused state; and a report from Dr. Greenwald that included the conclusion that "it is highly likely that [petitioner's] condition interfered with his ability to grasp and analyze the strength and weakness of the prosecutor's case and his ability to come to a rational conclusion about accepting a plea bargain."

Docket Entry No. 13-2, at 5-6 (citation to state law omitted, emphasis supplied).

>After Respondents filed their opposition to Petitioner's motion, making it abundantly

clear that Respondents were apprised of only the five Grounds stated in the Petition and of no

grounds six and seven, see docket Entry No. 14, Petitioner filed his reply to Respondents'

opposition.  See Docket Entry No. 15.  This reply, apparently capitalizing on Respondents'

unawareness of any grounds six or seven, asserted as follows:

> Respondent does not contest that petitioner would be entitled to relief on either or both of Ground Six and Ground Seven of the federal petition if the facts alleged are proven.  Respondent does not contest that petitioner requested a hearing in state court on the claims in Ground Six and Ground Seven of the federal petition. . . . Respondent does not even contest that, alternatively, the Court should exercise its discretion to hold an evidentiary hearing on Ground Six and Ground Seven because of the state courts' summary disposition of these grounds on the papers. Respondent contests only petitioner's request for a discretionary evidentiary hearing on Ground One of the Petition.

Docket Entry No. 15, at 1-2.

C.    **Presumed Scope Of Petitioner's Challenges**

It is, indeed, little wonder that Respondents did not address any challenges other than the challenges stated in Petitioner's Grounds One to Five: no other challenges were stated in the "Addendum," and Petitioner's answer to the <u>Mason</u> notice sealed *that* scope of his Petition. Moreover, had it not been for the last, unfinished sentence of Petitioner's "Addendum," reading merely "And I have . . . ," this Court, too, would have no reason to even fathom that Petitioner was ever planning to raise any challenges except for the five Grounds stated in the "Addendum," as entered in the record: neither Respondents not this Court are expected to be clairvoyant and guess the content of the pages they never received.[4]

However, out of abundance of caution – mainly driven by this Court's being mindful of the fact that the operations of Section 2254 and <u>Mason</u> notice are such that, if all Petitioner's habeas claims are not addressed by this Court now, Petitioner would face a high burden of establishing basis for leave from the Court of Appeals to file a second/successive Section 2254 petition in order to raise his remaining claims – this Court finds it in the interests of justice to make the maximum possible allowances to Petitioner and to read into his "Addendum" the apparently missing (but, from this point on, presumed lost by no fault of Petitioner) Grounds Six and Seven which – as Petitioner's statements made in his motion brief and motion reply

_____

[4] Indeed, this Court notes – with a great concern – Petitioner's seeming lack of good faith in this litigation, where every document submitted by Respondents unambiguously indicated that Respondents were appraised of only five Grounds stated in Petitioner's "Addendum" pages and had no reason to answer, respond, object, etc. to any other challenges.  Moreover, even at this juncture, this Court has no reason to find, as a fact, that Petitioner actually included in his "Addendum" any pages other than the pages received by the Clerk and entered in the record.

demonstrated – corresponded exactly to the two grounds discussed by the Appellate Division in

its denial of Petitioner's PCR application, which decision was replicated by this Court supra.[5]

## IV.   ANALYSIS

### A.   Ground One Does Not Merit Habeas Relief

The bulk of Petitioner's arguments raised in his "Addendum" pages, his traverse, his

motions and his reply to Respondents' opposition to his motions focus on Petitioner's position

that his trial court should have suppressed evidence of the interview conducted by Sergeant

Hayes and Detective Parker (and, specifically, of the statements made by Petitioner during that

interview) until the point in time when – upon Petitioner's statement that "something could have

happened . . . it's possible something may have happened between me and Jenny" – Petitioner

was advised by Sergeant Hayes of Petitioner's Miranda rights.

---

[5] As mentioned supra, Petitioner's PCR application also included a third ground, which – correspondingly – might have been Petitioner's "Ground Eight" for the purposes of his "Addendum." Driven by the same abundance of caution which prompted the Court to presume that Petitioner included in his "Addendum" Grounds Six and Seven, the Court will consider and briefly address that final Ground Eight at the conclusion of this Opinion. This total of eight grounds present the *maximum* amount of challenges Petitioner could have raised in this matter, since his direct appellate proceedings exhausted only his instant Grounds One to Five (that were actually stated in his "Addendum"), while his PCR proceedings raised his now-presumed-stated-in-the-"Addendum" Grounds Six and Seven (and the above-mentioned hypothetical Ground Eight). Any other challenges raised in the Petition would be facially unexhausted, causing either (a) an outright dismissal of the Petition as a "mixed" petition containing exhausted and unexhausted claims, or (b) Petitioner's withdrawal of all his unexhausted challenges upon the Court's leave that might have been granted to salvage Petitioner's opportunity to have this Court's review of his exhausted claims. Notably, the issue of stay and abeyance was never present in this matter: at no point Petitioner's multiple submissions made in this action made any mentioning of Petitioner's desire to litigate claims unexhausted in state courts and, correspondingly, to present this Court with a proof that these unexhausted claims could amount to colorable challenges within the meaning of Rhines v. Weber, 544 U.S. 269 (2005).

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  The Fourteenth Amendment incorporates the Fifth Amendment privilege against self-incrimination.  See Malloy v. Hogan, 378 U.S. 1, 8 (1964).  In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  Id. at 467.  When police ask questions of a suspect in custody without administering the required warnings, Miranda dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief.  See Oregon v. Elstad, 470 U.S. 298, 317 (1985).  Thus, a confession taken during a custodial interrogation without the provision of Miranda warnings violates the privilege against self-incrimination.  See Thompson v. Keohane, 516 U.S. 99 (1995).  "To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation."  Thompson, 516 U.S. at 107; see also Miranda, 384 U.S. at 479.  The Miranda Court outlined the procedures to be followed after the police provide these warnings.  If the accused requests counsel, then "the interrogation must cease until an attorney is present."  Miranda, 384 U.S. at 474.

Petitioner's allegation that the state courts erred in denying his Miranda suppression motion lacks merit.  The state courts invoked the correct law, held a pretrial hearing, and reasonably determined the facts in light of the evidence presented.  Based on a review of the

record, including the pretrial <u>Miranda</u> hearing, this Court can fathom no reason to upset the findings of the state court.  <u>See</u> <u>Fahy v. Horn</u>, 516 F.3d 169, 196 (3d Cir. 2008) (state court decision to reject petitioner's request for suppression was not "contrary to" Supreme Court precedent, as state court adhered to the correct standard; further, "the suppression court was entitled to make the credibility determination . . . and it applied the correct law to its findings of fact and came to a reasonable conclusion").

Furthermore, the mere fact that police used psychological techniques does not render Petitioner's statements involuntary.  During the course of an interrogation, it is generally recognized that the police may use some psychological tactics in eliciting statements.  <u>See</u> <u>Frazier v. Cupp</u>, 394 U.S. 731, 739 (1969); <u>Miller v. Fenton</u>, 796 F.2d 598, 605 (3d Cir.), <u>cert.</u> <u>denied</u>, 479 U.S. 989 (1986); <u>State v. Jacks</u>, 634 F.2d 390, 393 (8th Cir.), <u>cert.</u> <u>denied</u>, 450 U.S. 934 (1981).  The police may "attempt to create a climate which would be conducive to extracting inculpatory information."  <u>United States v. Boyce</u>, 594 F.2d 1246, 1251 (9th Cir. 1979).

Here, the gist of Petitioner's Ground One position could be reduced to a single statement that – even though Petitioner was allowed to go to his residence unescorted to get the gym bag with paperwork, to stop by at a convenience store to obtain cigarettes and lottery tickets, that he was informed and signed a form indicating he could stop the questioning at any time and just leave, that he was allowed to walk out of the room to use the bathroom on numerous occasions, etc. – Petitioner still maintains that his trial court violated Petitioner's constitutional rights by making a factual finding that the pre-<u>Miranda</u> part of Petitioner's interview was conducted while Petitioner was not "in custody."  In support of his position, Petitioner maintains that he felt "in custody" during this pre-<u>Miranda</u> interview period, and Sergeant Hayes and Detective Parker

24

must have felt that Petitioner was a crime suspect even before they learned that a crime was actually committed.

However, as noted supra, the court sitting in habeas review must give deference to factual determinations made by state courts.  See Duncan, 256 F.3d at 196; Dickerson, 90 F.3d at 90. That means that federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary."  Stevens, 295 F.3d at 368.

Here, as Respondents correctly point out, the test for determining whether a person is "in custody" for the purposes of Miranda warning is an objective one.  Consequently, Petitioner's claims as to his personal perceptions or emotions (which he, allegedly, experienced by e.g., upon seeing the door of the interview room closed from the outside) and his conjecture as to the state of mind experienced by Sergeant Hayes and Detective Parker are wholly irrelevant to the issue at hand: these personal emotions and conjecture cannot amount to any relevant evidence and, a fortiori, these self-serving retrospects cannot amount to "clear and convincing evidence" offsetting the state courts' finding that Petitioner was not "in custody" during this pre-Miranda interview period, and that he was free to stop the interview and just leave.  Therefore, Petitioner's Ground One challenges will be dismissed, since the state courts' findings with regard to this claim were not contrary to the governing Supreme Court precedent.

**B.**     **Ground Two Does Not Warrant Habeas Relief**

In his Ground Two, Petitioner asserts that his trial court violated Petitioner's constitutional rights when, after conducted a hearing, the trial judge concluded that evidence of the five incidents of domestic violence between Petitioner and Juanita were admissible.

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  The admissibility of evidence is generally a question of state law which is not cognizable under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the contention that the trial court erred in admitting the victim's testimony of a prior flirtatious conversation, we find that, if there was any error in the court's ruling . . . that error was at best one of interpretation of the state's law of evidence and did not arise to constitutional dimensions").  In Estelle v. McGuire, 502 U.S. 62, the Supreme Court held that the state court's admission in petitioner's trial for murdering his infant daughter of the testimony of two physicians that the child had suffered incidents of child abuse prior to the murder (evidence of rectal tearing that was six weeks old and rib fractures that were seven weeks old) did not violate due process.

> The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point.  Concluding, as we do, that the prior injury evidence was relevant to an issue in the case, we need not explore [any] assumption . . . that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence that is not relevant to be received in a criminal trial. [Once the issue of relevance has been established, w]e hold that [the petitioner's] due process rights were not violated by the admission of the evidence.

Id. at 70; accord Charlton v. Franklin, 503 F. 3d 1112, 1115 (10th cir. 2007) (state court's admission of evidence of petitioner's prior bad acts (such as hitting, ripping a phone cord from the wall in order to attempt choking, using a belt to attempt chocking, trying to disguise the belt

marks with hickeys, using a box knife to threaten), as well as admission of hearsay conversation, all in violation of state law, did not render trial fundamentally unfair to warrant habeas relief).[6]

Furthermore, there is no Supreme Court precedent this Court is aware of which clearly establishes that the admission of other crimes or bad acts evidence constitutes a violation of federal constitutional rights.  Accord Minett v. Hendricks, 135 Fed. App'x 547 (3d Cir. 2005) (rejecting claim that admission of "other crimes" evidence is contrary to or an unreasonable application of clearly established Supreme Court precedent).  Moreover, Supreme Court cases strongly suggest the contrary.  See, e.g., Estelle v. McGuire, 502 U.S. 62 (allowing evidence of prior injuries in a trial for infant murder); Spencer v. Texas, 385 U.S. 554 (1967) (the state had a legitimate purpose for allowing the use of prior convictions, and the possibility of some collateral prejudice did not render the evidentiary ruling unconstitutional).  "[The Supreme] Court has held on numerous occasions that it is not an unreasonable application of clearly established federal

---

[6] In cases not governed by the AEDPA, the Third Circuit has held that the admission of evidence may violate due process where the evidence are so inflammatory as to have "undermine[d] the fundamental fairness of the entire trial."  Keller v. Larkins, 251 F. 3d 408, 413 (3d Cir. 2001); see also Lesko v. Owens, 881 F. 2d 44, 51 (3d Cir. 1989) ("the erroneous admission of evidence that is relevant, but excessively inflammatory, might rise to the level of a constitutional violation"); Bisaccia v. Attorney General of State of New Jersey, 623 F. 2d 307, 313 (3d Cir. 1980) (when "the probative value of . . . evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law"); but see Albrecht v. Horn, 485 F. 3d 103, 128 (3d Cir. 2007) ("Where evidence of a defendant's prior bad acts [that are highly inflammatory] is admitted, a defendant's interests are protected by a limiting instruction, which mitigates the possibility of prejudice").  However, Section 2254(d)(1) of the AEDPA does not permit this Court to grant habeas relief based on Third Circuit – or any circuit court's – precedent.  Moreover, the admission of evidence challenged by Petitioner in this action cannot meet the Third Circuit standard in any event: here, Petitioner's displeasure with admission of evidence is not based on the fact that the evidence of prior bad acts were inflammatory, rather, his challenges are based on similarity between the wrongful acts underlying Plaintiff's February 13, 1998, assault on Juanita (when he tried to choke her, leaving visible red marks on her neck) and her November 20, 1998, death of asphyxia brought about by manual strangulation.

law for a state court to decline to apply a specific legal rule that has not been squarely established

by this Court." Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (quotations omitted).

Therefore, Petitioner's Ground Two challenges will be dismissed, since the state courts'

findings as to this claim were not contrary to the governing Supreme Court precedent.

### C.      Ground Three Does Not Warrant Habeas Relief

Petitioner's legal theory and factual predicate asserted in his Ground Three are reduced to

a sole line stating that his inculpatory statements should have been deemed inadmissible because

they were not electronically recorded.[7]

There is no precedent by the United States Supreme Court to that effect.  The supreme

courts of Alaska and Minnesota require recording of custodial questioning.  See Stephan v. State,

711 R.2d 1156, 1158 (Alaska 1985); State v. Scales, 518 N.W.2d 587, 592 (Minn. 1994).  In

May 2004 (that is, years after Plaintiff's conviction), the Supreme Court of New Jersey wrote,

"we perceive benefits to all involved if custodial interrogations are recorded electronically" and

appointed a committee "to examine and make recommendations on the use of electronic audio

and video recording of custodial interrogations" so that the court may evaluate fully the

protections that electronic recordation affords both to the state and to the criminal defendants.

State v. Cook, 179 N.J. 533 (2004).

Respondents read Petitioner's Ground Three as referring to the above-quoted statement

by the Cook court, and this Court agrees with Respondents' deducement.  However, the Cook

---

[7]  The Court notes, in passing, that Petitioner's challenges stated in his Ground Three are
halfhearted at best, since – upon conclusion of his interview, Petitioner was, in fact, asked to give
a formal taped statement, but he said that he was "not mentally prepared" to do so.  Now,
Petitioner tries to take his election (to decline the officers' offer to give a taped statement) to his
advantage: by asserting that it were the officers who erred in not producing a recorded statement.

holding did not provide any actionable basis to Petitioner's Ground Three (since the <u>Cook</u> court merely appointed a committee to investigate the advantages and disadvantages of the technique) and – in any event, and paramountly here – even had <u>Cook</u> outright found that electronic recordation was required, such holding would still be irrelevant to Petitioner's challenges at bar: not only because <u>Cook</u> was decided many years after Petitioner's conviction, but because <u>Cook</u> is a purely state law.

Since there has been no Supreme Court precedent requiring, at the time of Petitioner's conviction, that a criminal defendant's statements must be recorded to qualify as admissible evidence (and, in fact, there is still no Supreme Court precedent to that effect at the time when this Court is drafting this Opinion), the state courts' determinations as to Petitioner's Ground Three challenges cannot be deemed an unreasonable application of Supreme Court precedent. <u>See</u> <u>Knowles</u>, 129 S. Ct. At 1419.  Therefore, Petitioner's Ground Three will be dismissed as not warranting habeas relief.

      **D.**    **<u>Grounds Four and Five</u>**

The state courts dismissed Petitioner's challenges corresponding to the instant Grounds Four and Five without a discussion, as not warranting an examination in a written opinion. Therefore, for the purposes of this Court's review, these challenges are deemed dismissed by the state courts on merits.

      **1.**    **Ground Four Does Not Warrant Habeas Relief**

In his Ground Four, Petitioner asserts that his trial court unduly denied admission of certain evidence.  However, as noted <u>supra</u>, issues of admissibility of evidence are, generally, questions of state law and not subject to federal habeas review, <u>see</u> <u>Estelle</u>, 502 U.S. at 68;

Johnson, 117 F.3d at 112-15; Keller, 251 F.3d at 416 n.2, and federal courts must afford the

states deference in determinations regarding evidence and procedure.  See Crane v. Kentucky,

476 U.S. 683, 690 (1986).  Indeed, "a state court's misapplication of its own law does not

generally raise a constitutional claim.  The federal courts have no supervisory authority over state

judicial proceedings and may intervene only to correct wrongs of constitutional dimension."

Smith v. Horn, 120 F.3d at 414.

Evidentiary rulings may violate due process when the petitioner is denied fundamental

fairness at trial.  See Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir. 1994), cert. denied, 513 U.S.

881 (1994); Lisenba v. California, 314 U.S. 219, 228 (1941) (holding that state court's

evidentiary rulings may form the basis for habeas relief only when they "so infused the trial with

unfairness as to deny due process of law").  The appropriate inquiry is "whether the claimed error

of law is a fundamental defect which inherently results in a complete miscarriage of justice or in

an omission inconsistent with the rudimentary demands of fair procedure."  Hutchins v. Hundley,

1991 WL 167036 at *4 (D.N.J. Aug. 22, 1991) (citing United States v. De Luca, 889 F.2d 503,

506 (3d Cir. 1989), cert. denied, 496 U.S. 939 (1990)) (other citations omitted).  The Supreme

Court has held that "an otherwise valid conviction should not be set aside if the reviewing court

may confidently say on the whole record that the constitutional error was harmless beyond a

reasonable doubt."  Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).  An error is not harmless

if "it aborts the basic trial process or denies it altogether."  Hutchins, 1991 WL 167036 at *5

(citing Rose v. Clark, 478 U.S. 570, 578 n.6 (1986)).

Here, Petitioner maintains that evidence of Juanita's potential involvement in a sexual

conduct prior to her death (i.e., a certain "'wet' condom") or evidence of her employ (i.e., a photo

of the bar where she allegedly worked), etc., should have been admitted.  However, the trial

court's decision to decline Petitioner's late-received requests for introduction of this evidence

neither aborted the basic trial process nor denied it altogether, especially if this evidence is

weighed against the body of evidence connecting Petitioner to Juanita's murder.[8]  Simply put,

Petitioner has not shown that the trial process was fundamentally unfair.  Therefore, Petitioner's

Ground Four challenges will be dismissed, since the state courts' ruling as to this line of

challenges was not an unreasonable application of Supreme Court precedent.

## 2.    Ground Five Does Not Warrant Habeas Relief

In his Ground Five, Petition argues that his trial judge should have recused himself from

presiding over Petitioner's trial because the judge asked Petitioner's counsel's such questions as

"Are you intentionally trying to make this case so old that the evidence will be of no moment?"

or "I have to give pause to determine whether or not . . . this late discovery of this material in

your possession, and this bringing it to my attention as a surprise" or because the trial judge

---

[8]  Indeed, the Court finds itself at loss pondering over what information a photo of the bar, where Juanita allegedly worked, could add to Petitioner's defense.  Analogously, the allegations of Juanita's sexual activities do not appear related to her death, since there was no dispute that her death was caused by manual strangulation (rather than by any injuries associated with a sexual conduct).  Moreover, the fact that Juanita's body/car was found in a neighborhood allegedly suffering from the social plagues of drugs and prostitution appears equally irrelevant, since Juanita's dead body was found *in* the trunk of her car, suggesting that she did not drive her car to the neighborhood where the car was found.  Analogously, the alleged fact that Juanita's body was found naked seems to add nothing to Petitioner's defense, since the body could have been undressed before or after death and, in any event, this act could have been done by Petitioner who, during either his struggle with and/or strangulation of Juanita, could very well remove her clothing and gag her mouth with her underpants.  Indeed, no statement in the transcripts of Petitioner's trial or Petitioner's instant allegations suggest that Petitioner would not or could not do any of these acts: these facts, even if true, would neither provide Petitioner with an alibi nor add a particle of reasonable doubt as to his guilt.

31

commented to Petitioner's defense counsel that he was "starting to get a very uneasy feeling . . . that [he was] getting his chain yanked," etc.

Petitioner mistakes undue bias (which, if present, warrants recusal) with lack of pleasantries in exchanges.  However, the legal system – including the court system – does not require its participants to practice social etiquette.

Within the workings of federal courts, 28 U.S.C. § 455(a) governs the issue and provides that "any justice, judge or magistrate [judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Section 455(a) requires judicial recusal "if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge" of his/her interest or bias in a case.  Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988); In re Kensington Intern. Ltd., 368 F.3d 289, 301 (3d Cir. 2004).   In making this determination, the court must consider how the facts would appear to a "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person."  U.S. v. Jordan, 49 F.3d 152, 156 (5th Cir. 1995); accord Clemens v. United States District Court for the Central District of California, 428 F.3d 1175, 1178 (9th Cir. 2005); Matter of Mason, 916 F.2d 384, 386 (7th Cir. 1990).

"[B]eliefs or opinions which merit recusal must involve an extrajudicial factor," Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 167 (3d Cir. 2004) (internal quotation marks and citation omitted), and the Supreme Court has made it clear that "judicial rulings alone almost never constitute a valid basis" for recusal.  Liteky v. United States, 510 U.S. 540, 555 (1994).  The reason for this rule is that judicial decisions "in and of themselves can only in the rarest of circumstances evidence the degree of favoritism or antagonism required" to prove bias.

32

Id.  Consequently, a judge's prior adverse rulings cannot verify for the bias necessary for recusal under 28 U.S.C. § 455(a).  See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1103 (11th Cir. 2001); United States v. Pearson, 203 F.3d 1243, 1277 (10th Cir. 2000); Leslie v. Grupo ICA, 198 F.3d 1152, 1160 (9th Cir. 1999); United States v. Arena, 180 F.3d 380, 398 (2d Cir. 1999); Matter of Hipp, Inc., 5 F.3d 109, 116 (5th Cir. 1993).  This is true even if the judge consistently made adverse rulings against the party, see McCalden v. California Library Assoc., 955 F.2d 1214, 1224 (9th Cir. 1990); United States v. Mobile Materials, Inc., 881 F.2d 866, 877 (10th Cir. 1989), because an adverse decision, even if it is adverse on all issues raised, is not evidence of bias, especially when it is supported by the law and facts.  See Crenshaw v. Hodgson, 24 Fed. App. 619, 621 (7th Cir. 2001) (citing Gleason v. Welborn, 42 F.3d 1107, 1112 (7th Cir. 1994); Byrne, 261 F.3d at 1103).

Finally, it should be noted that, where issues of recusal arise, a judge "has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified."  Laird v. Tatum, 409 U.S. 824, 837 (1972); see also Clemens, 428 F.3d at 1179; Sensley, 385 F.3d at 598-99; Nichols v. Alley, 71 F.3d 347, 351 (10th Cir. 1995).

Here, as Respondents correctly point out, the same rationale applies to assessment of state judges.  See Docket Entry No. 11, at 14-15 (quoting Liteky v. United States, 510 U.S. at 555-56, for the propositions that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . .  Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as . . . judges, sometimes display").

33

Petitioner cites nothing but his trial judge's remarks to Petitioner's counsel requesting not to unduly delay the proceedings.  None of these statement suggests, even remotely, presence of extrajudicial factors that might have warranted recusal.  Therefore, the state courts' dismissal of Petitioner's recusal challenges were not an unreasonable application of the governing Supreme Court precedent, and Petitioner's Ground Five will be dismissed.

      **E.**      **Presumed-Stated-In-the-"Addendum" Grounds Six and Seven**

          **1.**      **The Governing Legal Regime**

Since Petitioner's presumed-to-be-included-in-the-"Addendum"-but-lost-through-no-fault-of-Petitioner Grounds Six and Seven address the issues associated with performance of Petitioner's defense counsel, it appears warranted to start this last section of the Court's analysis with a summary of the governing law.

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-88.[9]  The court must then determine whether, in light of all the

---

      [9] See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the

                                                               (continued...)

circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.  See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[10]

The Strickland test applies to the performances of both trial and appellate counsel.  See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004).  When the issue is appellate counsel's

------

[9](...continued)
wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

[10]  The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."  Strickland, 466 U.S. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

failure to raise specific issues, a petitioner satisfies the first Strickland prong by showing that appellate counsel was "objectively unreasonable [i.e.,] that counsel failed to find [arguably] nonfrivolous issues and to file a merits brief about them." Smith v. Robbins, 528 U.S. 259, 285 (2000). An arguably nonfrivolous issue is "one that counsel can argue in good faith with some potential for prevailing." Id. Consequently, the general principle established by Smith is that appellate counsel need not raise every non-frivolous issue on appeal; he "may select from among them in order to maximize the likelihood of success on appeal." Id. at 288; see also Jones v. Barnes, 463 U.S. 745, 750 (1983) (rejecting "per se rule that appellate counsel must raise every nonfrivolous issue").

## 2.  Ground Six, If Presumed Stated, Warrants No Habeas Relief

In his motion, Petitioner stated that his Ground Six alleged "trial counsel's failure to determine the inability of petitioner to understand the plea offer" and asserted, as factual predicate in support of this claim, the discussed-by-the-Appellate-Division report from Dr. Greenwald, which included the conclusion that "it is highly likely that [Petitioner's] condition interfered with his ability to grasp and analyze the strength and weakness of the prosecutor's case and his ability to come to a rational conclusion about accepting a plea bargain." Docket Entry No. 13-2, at 5-6.

It is undisputed that counsel's outright "fail[ure] to inform the defendant of a plea offer could amount to ineffective assistance of counsel" within the meaning of the first prong of Strickland. See Wheeler v. Rozum, 410 Fed. App'x 453, 456 (3d Cir. 2010) ("The [district] court found that [petitioner] had succeeded in demonstrating that the [state] had extended a plea offer . . . , and that appointed counsel had failed to convey that offer. Therefore, [petitioner] had

satisfied the first prong of <u>Strickland</u>").  However, here, there is no dispute that Petitioner's counsel *did* convey the plea offer to Petitioner, and Petitioner vehemently rejected this offer. There is also no dispute that, prior to commencement of Petitioner's trial, Petitioner's counsel *did* retain Dr. Verdon, a psychiatrist, to examine and evaluate Petitioner, and Dr. Verdon concluded that Petitioner "was oriented to person, place, and time," and that "his recent memory and remote memory were intact."  Consequently, stripped of all niceties, Petitioner's Ground Six effectively asserts that Petitioner's counsel should have somehow determine that – regardless of how vehemently Petitioner was rejecting the plea deal and no matter what a trained psychiatrist concluded – Petitioner must have been operating without full mental capacity if Petitioner found the plea offer insufficiently attractive and/or continued insisting on his innocence.

However, legal counsel are not meant to act as psychiatrists, just as they are not expected to "barge" their clients into accepting the plea offers.  Indeed, had Petitioner's counsel acted in such a fashion, these actions would have been a violation of the counsel's ethical obligation and, in addition, would render the so-obtained plea potentially involuntary and, thus, constitutionally unfirm.  What Petitioner's counsel was expected to do was to act within "objective standard of reasonableness," and it was objectively reasonable for a defense counsel to clearly convey a plea offer to the client and to stop at that; there is no dispute that Petitioner's counsel did so. Therefore, Petitioner's allegations already fail to meet the first prong of <u>Strickland</u> for these reasons.  <u>Cf.</u> <u>Dedushaj v. Graham</u>, 2008 U.S. Dist. LEXIS 92561 (S.D.N.Y. Nov. 7, 2008).

Moreover, here, the state courts made factual findings that the plea offer was duly conveyed to Petitioner by his counsel, *and that Petitioner sufficiently understood it*.  Petitioner does not offer this Court "clear and convincing evidence to the contrary," <u>Stevens</u>, 295 F.3d at

368; rather, he self-servingly asserts is that his counsel should have concluded that Petitioner was not capable of understanding the conveyed information simply because Petitioner rejected the offer. However, such self-serving conjecture cannot show that Petitioner's counsel's performance fell below objective standard of reasonableness. Therefore, Petitioner's Ground Six, even if actually included in the "Addendum" pages but lost through no fault of Petitioner, merits no habeas relief because the state courts' determination as to this line of challenges was not an unreasonable application of the Strickland test.

### 3. Ground Seven, If Presumed Stated, Warrants No Habeas Relief

In his another missing-but-presumed-stated ground, i.e., Ground Seven, Petitioner maintains that his counsel was ineffective because of the "counsel's failure to investigate a psychiatric defense," which this Court presumes to be either the defense of diminished mental capacity or a plea of not guilty on the grounds of insanity. See Docket Entry No. 13-2, at 5-6.

However, as the state courts correctly observed (and as Respondents correctly point out), Petitioner's counsel did, indeed, investigate Petitioner's mental capacity and, being informed by a trained psychiatrist that Petitioner was fully lucid, made a strategic election not to pursue this line of defense.[11] Moreover, as both the state courts and Respondents noted, Petitioner's position

---

[11] In Rolan v. Vaughn, 445 F.3d 671 (3d Cir. 2006), the Court of Appeals addressed a failure-to-investigate claims within the context of Strickland. The holding of Rolan underscored two key principles governing this type of inquiry: (a) counsel is not obligated to chase after the wind; which means that (b) habeas relief might be warranted only upon the petitioner's showing that the information not utilized by the counsel was actually available to counsel and beneficial to the petitioner. See Strickland, 466 U.S. at 690-91; see also Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); accord Lewis v. Mazurkiewicz, 915 F.2d 106 (3d Cir. 1990) (expressly adopting Strickland and Kimmelman rationale for the purposes of failure-to-investigate analysis); Cox v. Ricci, 2010 U.S. Dist. LEXIS 115711, at *10 (D.N.J. Oct. 29, 2010) (adopting state law position that a litigant must do more "than make bald assertions that he was denied the effective

(continued...)

that his counsel should have kept searching for some evidence capable of creating a basis for

Petitioner's defense based on mental incompetence was wholly incompatible with Petitioner's

chosen defense strategy, i.e., that Petitioner was in lucid mind on the date of Juanita's death and

that he was not present at the crime scene.[12]  Accordingly, the state courts' dismissal of

Petitioner's challenges corresponding to his Ground Seven (that is, if such ground was actually

stated in Petitioner's "Addendum" but the pages containing that ground were presumed lost by

no fault of Petitioner's) was not an unreasonable application of the governing Supreme Court

precedent, and Petitioner's Ground Seven will be dismissed as not warranting habeas relief.[13]

---

[11](...continued)
assistance of counsel[;] [h]e must allege facts sufficient to demonstrate counsel's alleged
substandard performance" for the purposes of federal Strickland-based analysis); Johnson v.
Hauck, 2008 U.S. Dist. LEXIS 100704, at *34 (D.N.J. Dec. 8, 2008) (same); Ukawabutu v.
Cathel, 2008 U.S. Dist. LEXIS 33708, at *125 (D.N.J. Apr. 24, 2008) (same); King v. Powell,
2008 U.S. Dist. LEXIS 31652, at *29 (D.N.J. Apr. 15, 2008) (same).  Here, Petitioner does not
assert that he provided his defense counsel with any leads to investigate that would allow the
counsel to detect evidence of Petitioner's mental incapacity at the time of Juanita's murder.

[12]  Indeed, introduction of both defenses simultaneously, i.e., the theory of the case that
Petitioner was in clear mind and not present at the crime scene and yet, at the same time, suffered
of diminished capacity and was present at the crime scene while killing his wife, would be
devastating to Petitioner's defense.  Therefore, it was strategically logical for Petitioner's counsel
to make an election in favor of only one of these two theories, i.e., since Petitioner kept insisting
on his innocence, his counsel was effectively bound to forfeit any theory based on not-guilty-by-
the-reason-of-insanity defense.  Thus, Petitioner's counsel made a strategic choice which this
Court finds clearly within the boundaries of objective standard of reasonableness, and
Petitioner's claims to the contrary fail to meet even the first prong of Strickland.

[13]  Finally, the Court notes the third and last point raised by Petitioner during his PCR
proceedings (such point could have been Petitioner's eighth ground in the "Addendum").  In that
point, Petitioner asserted that his appellate counsel failed to challenge performance of his trial
counsel because – according to the Petitioner – his trial counsel allowed him to appear before the
jurors looking "unkept."  See Docket Entry No. 11-8, at 4 (replicating Petitioner's final PCR
challenge).  However, as the Appellate Division's decision duly observed, Petitioner's defense
counsel *did* raise the issue to Petitioner's trial judge, and the trial judge *did* instruct the jurors
(continued...)

### F.     Certificate of Appealability

The Court must now determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.

The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "[A] petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003).

Here, the Court is persuaded that jurists of reason would not disagree with this Court's conclusion that neither Petitioner's five Grounds actually included in his "Addendum" nor Petitioner's two grounds mentioned in his motion papers (or the never-mentioned-by-any-means remaining ground raised as the third and final point during Petitioner's PCR proceedings) made a substantial showing of the denial of a constitutional right.

Therefore, no certificate of appealability will issue.

---

[13](...continued)
accordingly, hence removing any prejudicial inferences the jurors might have obtained from Petitioner's appearance.  <u>See id.</u> at 12-13 (replicating the relevant part of the trial court's instruction to the jurors).   Therefore, Petitioner's appellate counsel did not violate Petitioner's Sixth Amendment rights when the counsel elected not to challenge Petitioner's trial counsel's performance on this non-viable basis and, instead, raise five other grounds that, their weaknesses regardless, appeared nonfrivolous.  <u>See</u> <u>Smith</u>, 528 U.S. at 285; <u>see also</u>, <u>Jones</u>, 463 U.S. at750.  Correspondingly, the state courts' dismissal of Petitioner's challenges based on the selection of claims made by Petitioner's appellate counsel was not an unreasonable application of Supreme Court precedent, and Petitioner's claim raised as the third and last point during his PCR proceedings would have merit no habeas relief even if it were included, as Petitioner's eighth ground in his "Addendum."

**V.      CONCLUSION**

For the foregoing reasons, this Court dismisses the Petition and denies Petitioner a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  No certificate of appealability will issue, pursuant to 28 U.S.C. § 2253(C)(2).  Petitioner's motions will be dismissed as moot.

An appropriate Order accompanies this Opinion.


                                                      /s/ JOEL A. PISANO
                                                      **JOEL A. PISANO**
                                                      United States District Judge


Dated: July 22, 2011